Frank SIGNORILE, Martha Signorile, Theresa Desantis, Greg Signorile, a minor, By and Through his parent and natural guardian, Frank SIGNORILE, and John Giordano, a minor, by and through his parent and natural guardian, Susan Giordano, Plaintiffs,

v.

CITY OF NEW YORK, New York City Housing Authority, New York City Police Department, Sergeant John Paddock, Captain James Clarke, Sergeant Frank Whalen, Detective Sal Di Franco, Police Officers Charles Billings, Kevin Ottino, John Strype, Steven Parrilla, Joseph Tallarine, Thomas Wilson, Julio Lara, Steven Finnegan, Raymond Leshinger, Police Officer Gosling, New York City Housing Authority Police Officers "John Does 1 through 10," and New York City Police Department Officers "John Does 11 through 20," Defendants.

No. 91–CV–3324 (JS).

United States District Court, E.D. New York.

April 6, 1995.

Philip G. Minardo, Staten Island, NY, for plaintiffs.

Paul A. Crotty, Corp. Counsel of the City of N.Y. by Barbara Peabody, Asst. Corp. Counsel, New York City, for defendants New York City, New York City Police Dept. and New York City Police Officers.

Paul A. Krez, Jackson, Krez & Consumano, New York City, for defendants New York City Housing Authority and New York City Housing Authority Police Officers.

*MEMORANDUM AND ORDER*

SEYBERT, District Judge:

### INTRODUCTION

In this action, plaintiffs have alleged that defendant New York City police officers and New York City Housing Authority officers are liable under 42 U.S.C. § 1983 for, *inter alia,* false arrest, illegal searches, an improper show-up and excessive force [1] in connection with their response to a shooting on February 17, 1991 of a woman in the vicinity of Third Avenue and 58th Street in Brooklyn, New York. Plaintiffs also allege that the City of New York (the "City"), the New York City Police Department (the "NYPD") and the New York City Housing Authority (the "NYCHA") are municipally liable for not developing, implementing or enforcing police procedures intended to minimize the search and arrest of innocent persons, failing to conduct a good faith investigation of the incident and similar police operations and failing to discipline employees accordingly. Plaintiffs also assert numerous state causes of action. Discovery appears to be nearly completed in this action. Presently before the Court are two outstanding motions: (1) plaintiffs' motion for leave to file a second amended complaint which deletes the causes of action under 42 U.S.C. §§ 1981, 1985 and 1986 and adds the names of additional individual defendants who were previously known as "John Does" and (2) defendants' motion to dismiss the proposed second amended complaint and for summary judgment.

### BACKGROUND

A. *Undisputed Facts and Plaintiffs' Version of Disputed Facts*

On the afternoon of February 17, 1991, at approximately 1:24 p.m., the NYPD received a telephone call that a woman had been shot in the side or the chest on Third Avenue and 59th Street in Brooklyn, New York. Within five minutes of the incident, the police received information that the car driven by the

assailants was a grey Jaguar. Within the next 45 minutes, the police were alerted that the Jaguar was a newer-model, light-gray, four-door sedan, that the assailants were two white male youths, that the Jaguar's license plate number was "XBW–656" and that the car was possibly headed in the direction of the Verrazano Bridge.

Defendant Sergeant Paddock of the NY-CHA testified that he was driving with his partner, NYCHA Officer John Strype, in a marked patrol car on Hylan Boulevard in Staten Island in the direction of the Verrazano Bridge when he heard the radio transmissions regarding the shooting. At the same time, Frank Signorile ("Signorile"), a 55–year old white male, was driving in a white 1989 Jaguar from Brooklyn over the Verrazano Bridge to his home at 395 Naughton Avenue on Staten Island. Signorile's car was clean on the date in question, and the roads were dry.[2]

Shortly thereafter, Paddock spotted Signorile's car travelling in the opposite direction on Hylan Boulevard. The vehicle was proceeding at a normal rate of speed. Paddock was unable to see who was in the vehicle because the windows were tinted.

Paddock lost sight of the Jaguar when it made a left turn onto a side street. Strype, who was driving, proceeded to make a U-turn on Hylan and turn down Naughton Avenue, the street onto which the Jaguar had just turned. Signorile saw the police drive by his house and observe him getting out of the car.

While following Signorile's Jaguar, Paddock had noted that the first four digits of its license plate number, XBW–628, were identical to the license plate number of the assailant's car. Upon seeing the car parked in the driveway, Paddock ran a check which confirmed that the home to which the license plate was registered was 395 Naughton Avenue.

---

1. The record is unclear as to whether plaintiffs are pursuing a separate claim of excessive force.

2. A report (the "Report"), dated September 29, 1991, prepared by Lieutenant Grossane of the NYPD's Civilian Complaint Review Board found

that "Mr. Signorile's auto was viewed and it is a snow-white auto. It is doubtful in this investigator's mind the auto could be mistaken for gray." (Report at ¶ 4.)

Paddock then requested assistance. He testified that he only called for one vehicle to assist him and that he specified that it was a non-emergency situation.[3] It appears, however, that six vehicles responded. Paddock acknowledged "many more radio cars than were necessary" appeared. (Paddock Dep. at 37.)

Approximately twenty to thirty minutes after entering his home, Signorile was informed by a neighbor that the police had surrounded their house. When he looked outside, he noticed "an officer in SWAT-type gear (a helmet and vest) behind the railing of the steps leading to my mother-in-law's door. He was pointing a shotgun at the door. Another officer was behind him with a gun drawn. The officer was yelling at someone to get out." (Signorile Aff. at ¶ 5.) Signorile's wife "opened the window and we asked what was going on. Officer Billings told us to remain inside." (Id. at ¶ 6.) At that point, Signorile, who lived in the upstairs apartment, "started to go outside. Before I could get downstairs, the officer with the shotgun who had been at my mother-in-law's door rushed in with another officer. Pointing his shotgun at us from the foot of the steps, he ordered us out with our hands up." (Id. at ¶ 6.)

Signorile, Greg Signorile, Signorile's then 15–year old son, and John Giordano, Greg Signorile's then 14–year old friend who had stayed overnight at the Signorile's home, allege that they were taken outdoors and frisked against the side of the house. NYPD Officer Parrilla of the 68th precinct in Brooklyn frisked Signorile. Greg Signorile was not wearing a shirt and Giordano was wearing only a T-shirt sweatpants and socks. Greg Signorile and Giordano were kept in a frisk position for approximately 10 to 15 minutes in thirty-degree weather. Paddock and Parrilla proceeded to question Signorile about the shooting in Brooklyn involving a Jaguar similar to his own.

During this time, Martha Signorile, Signorile's wife, was permitted to remain in the house, as she was recuperating from surgery. Another officer came in and stayed with her inside the house. Mrs. Signorile asserts that the officer with the shotgun, later identified as Billings, and another officer went upstairs and searched through parts of the house. Signorile testified that in "[m]y son's room, his books were all thrown on the floor, drawers were open, clothes were all over the place." (Signorile Dep. at 74.) Mrs. Signorile stated that "[t]hey went into my son Greg's room and searched it extensively, including dumping out the contents of his schoolbag." She also testified that "[t]he big guy opened my two closet doors that are in my foyer." (Martha Signorile Dep. at 14.)

NYPD Captain Clarke of the 122nd Precinct on Staten Island instructed that the Jaguar be searched without Signorile's permission. Parrilla entered Signorile's apartment to obtain keys to search Signorile's Jaguar. A number of police officers, including Parrilla, proceeded to search Signorile's car. When Parrilla could not find anything in the car, he began roughly treating the car, slamming car doors and the trunk and breaking a heating panel. Afterwards, either Paddock or Parrilla took Signorile aside and told him that he, his son and Giordano would have to travel to Lutheran Medical Center to be viewed by the woman who had been shot. Paddock or Parrilla informed Signorile that if he and the others did not comply, they would be arrested.[4] Parrilla also decided that Signorile would not be permitted to drive his own car to the hospital and would have to travel there in a patrol car.

Signorile, Greg Signorile and Giordano were subsequently taken in Paddock and Strype's patrol car to the hospital where the victim was being treated, and a show-up was conducted. The victim failed to identify any of the three as the assailants. The keys to Signorile's car were returned to Signorile

---

3. Police radio transmissions filed with the Court indicate that a general "assist police officer" message was relayed.

4. Signorile's affidavit submitted in opposition to defendants' motion for summary judgment conflicts with his deposition in that the affidavit expressly states that Paddock threatened him with arrest whereas the deposition testimony reveals that the same officer who searched Signorile's car, identified by Signorile as being Parrilla, was the one who threatened him with arrest.

along with his automobile which Parrilla had driven to the hospital.

## B. *NYCHA Sergeant Paddock's Deposition Testimony*

Paddock testified that while he was following Signorile's Jaguar, the car was weaving in and out of traffic at a high speed. The Jaguar initially appeared to Paddock to be light gray in color. Paddock admits, however, that after Signorile and the others had been taken from the apartment, he had an opportunity to observe the car more closely and found that it was in fact off-white in color and dirty from salt and grime.

Contrary to Signorile's assertion, Paddock first saw Signorile "when Emergency Service brought him out of the house" (Paddock Dep. at 50) and not as Signorile was getting out of the Jaguar. When asked to describe Signorile's age at a deposition, Paddock testified that "he could be in his late thirties." (Paddock Dep. at 54.)

Paddock did not instruct the Emergency Service officers to enter Signorile's apartment. Paddock denies ever entering the house himself, a fact disputed by Signorile and Sergeant Whalen, a NYPD sergeant in the 72nd precinct in Brooklyn, who testified that he saw Paddock enter Signorile's apartment after the "suspects" were outside.

Paddock also did not direct anyone to search the car nor saw anyone search it. Paddock asked Signorile to participate in a show-up after receiving an indication from Whalen that a detective with whom Whalen had conferred by telephone had requested that Signorile submit to a show-up. Paddock did not threaten Signorile with arrest if he, his son and Giordano did not agree to the show-up. To the contrary, Signorile voluntarily agreed to the show-up. Paddock told Signorile that he could drive his own car to the hospital but it later "became determined that he would ride with us . . ." in the police car. (Paddock Dep. at 71.)

Paddock thought that "[a]t the point where people are being brought out of the house and the house is being made to be secure so no one will be hurt, Emergency Service is in charge of the scene." (Paddock Dep. at 57.)

Moreover, he stated that "[a]t the point where the people are outside, I took over, along with Sergeant Whalen, to try to ascertain if these people were indeed involved in the shooting." (Paddock Dep. at 57.)

Paddock recollects that, despite at least five efforts, he never received any further information about the description of the two suspects involved in the shooting. When asked what response he obtained with each attempt, Paddock responded "[s]ometimes I would get none. Sometimes my attention would be drawn away from listening to the radio to see what was going on, so I couldn't listen to it and I wouldn't hear the response anyway." (Paddock Dep. at 63.)

## C. *NYCHA Officer Strype's Deposition Testimony*

Strype testified in a deposition that he and Paddock responded to 395 Naughton Avenue because they had seen a car fitting the description of the car involved in the shooting. Other than driving the patrol car that initially followed Signorile and transporting Signorile, Greg Signorile and Giordano for the show-up, the record contains no other evidence linking Strype to the events at issue.

## D. *NYPD Officers Billings's and Ottino's Deposition Testimony*

Billings, a NYPD Emergency Service officer, testified that when he responded to Sergeant Paddock's call for assistance, Sergeant Paddock informed him that "several perps were wanted for a past shooting from Brooklyn and that the occupants of the vehicle he had followed was [sic] at the location around the corner." (Billings Dep. at 24.) Paddock himself claims to have informed one of the Emergency Service officers as to everything that transpired: "I told him we had an unknown amount of occupants in the jaguar, that we followed the car, it fit the description of the shooting, the plate number was two digits off, that it appeared to be driving at a high rate of speed, possibly to allude us. And it pulled down the block and we lost sight of it, made a U-turn, came up and the occupants were possibly-probably in the house." (Paddock Dep. at 38.) The deposition testimony of Ottino, Billings partner and

also an Emergency Service officer, confirms this rendition.

After talking with Paddock, Billings dressed in body armor and took his shotgun with him as he approached the house. Not certain as to which of the two apartments in the house the suspect(s) had entered, Billings first knocked on the apartment door of Signorile's mother-in-law, Theresa DeSantis. The haze and reflection on the door glass made it initially difficult for him to see who had come to the door. When he saw that the person on the other side was a 70– to 75–year old woman, "I took my weapon away and pointed it in a safe direction." (Billings Dep. at 46.)

When Billings subsequently approached the entrance to Signorile's apartment door, "a male exited the house at the location that I was at, at the time, and walked down a set of stairs towards us. When that happened, I entered the house by opening the door and stood at the bottom of the stairway." (Billings Dep. at 62.) Billings described the man as being white and between 40 and 50 years of age.

Billings acknowledges that no one instructed him to enter Signorile's apartment but that he opened the screen door to the apartment and walked in to "secure the door." (Billings Dep. at 69.) Billings further admits that he pointed his weapon towards the top of the inside staircase where Signorile's wife and son and Giordano were standing. He ordered everyone to keep their hands in plain view and asked the teenage boys to come down the stairs.

Billings, who was then joined by Ottino, proceeded up the stairs to the kitchen. At this point, Billings' shotgun was no longer pointed at Mrs. Signorile who had since entered the kitchen herself.

In the Report, Ottino denies having any confrontation with Signorile's mother-in-law. He admits entering Signorile's apartment in order to help secure it after other officers had already entered it. He claims not to have searched either the house or the car.

### E. NYPD Officers Parrilla's and Tallarine's Deposition Testimony

Although plaintiffs insist to the contrary, Parrilla denies searching the automobile, frisking Signorile or threatening Signorile with arrest. NYPD Officer Tallarine, who was Parrilla's partner, testified that he did not leave the street corner throughout the incident. He admits only to following the patrol car that transported Signorile and the teenagers to the show-up.

### F. NYPD Sergeant Whalen's and Officer Gosling's Testimony

Together with Paddock, Whalen was one of the senior officers involved in the incident. Whalen arrived at the scene just after the Emergency Service unit arrived and prior to any officer entering Signorile's home. Upon his arrival, Whalen was informed by Paddock that "[t]he car in the shooting is parked in the driveway over there, and the guys just went into the house." (Whalen Dep. at 46.) Whalen glanced at the car, and it appeared to him to be light gray in color. Whalen allegedly then asked Paddock what "his plan of attack was to get these people, but he just walked past me." (Whalen Dep. at 46.) Whalen also indicated that he did not ask for a description of the men whom Paddock told him went into the house.

Whalen admits that he entered the Signoriles' home without permission. He testified, however, that once he was inside, he saw Mrs. Signorile who gave him permission to use the telephone.

Whalen spoke to Detective Di Franco by telephone regarding whether a show-up should be conducted. Whalen claims that Di Franco responded simply, "You're going to have to bring them back to [the hospital]." (Whalen Dep. at 113.) Whalen also testified that Di Franco "didn't suggest anybody in particular. Whoever that we decided was possibly in the car." (Whalen Dep. at 82.) Whalen further stated that Di Franco "doesn't direct me. I just asked him for a suggestion." (Whalen Dep. at 104.)

Whalen then informed Paddock that "I spoke to the Detective on the case, and that we would have to do a show-up." (Whalen

Dep. at 114.) When asked whether Paddock would have understood this to be an order that a show-up take place or a suggestion, Whalen responded, "[a] suggestion." (*Id.* at 114.)

Upon questioning as to who was in charge during the investigation, Whalen testified that "Officer Paddock had commenced the initial investigation at that location." (Whalen Dep. at 51.) He later testified, however, that "[t]echnically, I am in charge of a scene like this until an Emergency Service supervisor responds to the scene." [5] (*Id.* at 52.)

Whalen did not recall that any of the police officers searched the Jaguar.

NYPD Officer Gosling's role in the investigation appears, from the current record, only to have involved serving as Whalen's driver and walking with Whalen to the back of Signorile's home to prevent anyone from exiting.

### G. *NYPD Captain Clarke's Deposition Testimony*

Captain Clarke testified that he overheard police activity at 395 Naughton Avenue involving Brooklyn units. Wondering what they were doing there, he went to the location but left soon thereafter. Paddock informed him that Signorile's car had been followed over the Verrazano Bridge to 395 Naughton Avenue and that a man gotten out of a Jaguar and walked into the house. Clarke concurred in the decision to bring Signorile, Greg Signorile and Giordano to the hospital for a show-up, agreed that the Jaguar should come as well and directed that the Jaguar be searched prior to doing so. He further asserted that Signorile handed him the car keys so that another officer could conduct a search of the Jaguar.

### H. *The Role of the Remaining Individual Defendants*

Nothing in the record identifies in detail the role that NYCHA Officers Finnegan, Lara, Wilson and Leshinger played in the incident except that Paddock testified that he ordered Lara and Finnegan to follow Greg

Signorile and Giordano into Signorile's apartment to obtain their coats.

### DISCUSSION

#### I. *Standard for Summary Judgment*

Defendants assert that they are entitled to summary judgment because the actions taken by the individual NYPD and NYCHA officers are protected by qualified immunity and, even if the officers were found to have violated plaintiffs' constitutional rights, plaintiffs have failed to adduce sufficient evidence with respect to the municipal defendants' liability. A court may grant summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute as to a material fact is "genuine," and summary judgment is inappropriate, if, after resolving all factual ambiguities and drawing all reasonable inferences in favor of the nonmoving party, the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Gallo v. Prudential Residential Serv. Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir.1994) (citations omitted); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir.1993); *Weg v. Macchiarola*, 995 F.2d 15, 18 (2d Cir.1993) (citations omitted); *Cruden v. Bank of N.Y.*, 957 F.2d 961, 975 (2d Cir.1992) (citation omitted); *Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 580 (2d Cir.1991) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989) (citations omitted). Thus, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment ..." *Anderson*, 477 U.S. at 247–8, 106 S.Ct. at 2510. Moreover, in cases such as the one at bar where a defense of qualified immunity is raised,

> the question of whether the factual disputes are material is even more critical. Plaintiffs may not unwrap a public officer's cloak of immunity from suit simply by alleging even meritorious factual disputes relating to probable cause, when those con-

---

**5.** No Emergency Service supervisor responded to the scene.

troversies are nevertheless not material to the ultimate resolution of the immunity issue.

*Cartier v. Lussier*, 955 F.2d 841, 845 (2d Cir.1992).

The party moving for summary judgment bears the burden under Fed.R.Civ.P. 56(c) of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Gallo*, 22 F.3d at 1223 (citations omitted); *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 572 (2d Cir.1993) (citations omitted). The non-moving party then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e).

## II. *Qualified Immunity*

A. *Liability of Officers with Respect to the Entry and Search of Signorile's Home and Car and the Conducting of a Show–Up*

Plaintiffs Signorile, Martha Signorile, Greg Signorile and Giordano argue that material factual disputes exist concerning the presence of probable cause and exigent circumstances for the police to enter Signorile's home, search Signorile's car and frisk and transport the men for a show-up, rendering summary judgment in favor of the NYPD and the NYCHA officers with respect to their personal liability inappropriate.[6] Defendants, on the other hand, assert that, even using plaintiffs' version of the facts and even assuming that probable cause and exigent circumstances did not support the actions taken by the officers, the officers are entitled to qualified immunity as to personal liability. Indeed, "the question of qualified immunity is a legal issue that is entirely distinct from the factual question of probable cause ... and one that is suitable for summary judgment in order to protect government officials in appropriate circumstances from unnecessary litigation of factual issues." *Kornatowski v. Wallingford Police Dept.*, 1993 WL

299032 at *2, 1993 U.S. Dist. LEXIS 10695 at *7 (D.Conn. July 27, 1993) (J. Cabranes) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) and *Cartier*, 955 F.2d at 845); *see also Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir. 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 721, 130 L.Ed.2d 627 (1995).

Qualified immunity shields police officers from personal liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, ... or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights ..." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir.1991) (citing, among other cases, *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)), *cert. denied*, —— U.S. ——, 112 S.Ct. 3032, 120 L.Ed.2d 902 (1992); *see also Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir.1993). The right to protection from a warrantless police entry into one's home when such an entry is unsupported by exigent circumstances is a clearly established constitutional right. *See Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980) ("It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable"); *United States v. Medina*, 944 F.2d 60, 68 (2d Cir.1991) (citations omitted) *cert. denied*, 503 U.S. 949, 112 S.Ct. 1508, 117 L.Ed.2d 646 (1992). Also clearly established as constitutional rights are the prerogatives not to be arrested or searched, other than in a frisk grounded in reasonable suspicion, without probable cause. *Terry v. Ohio*, 392 U.S. 1, 27, 30, 88 S.Ct. 1868, 1883, 1884, 20 L.Ed.2d 889 (1968); *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983); *Oliveira*, 23 F.3d at 642; *Soares*, 8 F.3d at 920. Moreover, absent reasonable suspicion that a person may be

---

**6.** Even though Giordano did not live in Signorile's home, he has standing to sue under Section 1983 for the police's entry into Signorile's home since, as an overnight guest, he had a reasonable expectation of privacy in his host's home, whether or not he was left alone in the house or given a key. *See Minnesota v. Olson*, 495 U.S. 91, 98–100, 110 S.Ct. 1684, 1688–89, 109 L.Ed.2d 85 (1990).

armed or dangerous, a law enforcement officer is not entitled to frisk that person. *See Terry,* 392 U.S. at 24, 88 S.Ct. at 1881; *United States v. Alexander,* 907 F.2d 269, 272 (2d Cir.1990), *cert. denied,* 498 U.S. 1095, 111 S.Ct. 983, 112 L.Ed.2d 1067 (1991) ("A law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists." (citations omitted)).

■ Even where the constitutional rights at issue are clearly established, the granting of summary judgment to a law enforcement officer may nonetheless be permitted if he or she " 'adduces sufficient uncontroverted facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant' to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Frank v. Relin,* 1 F.3d 1317, 1328 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993); *see also Oliveira,* 23 F.3d at 649; *Hurlman v. Rice,* 927 F.2d 74, 78 (2d Cir.1991); *Warren v. Dwyer,* 906 F.2d 70, 75 (2d Cir.1990); *Robison v. Via,* 821 F.2d 913, 921 (2d Cir. 1987). Thus, an officer would be entitled to qualified immunity as a matter of law with respect to a situation where exigent circumstances, probable cause or reasonable suspicion were needed if the undisputed facts and all permissible inferences favorable to the plaintiff show either that (a) it was objectively reasonable for the officer to believe that exigent circumstances, probable cause or reasonable suspicion existed, respectively, or (b) officers of reasonable competence could disagree on whether exigent circumstances, probable cause or reasonable suspicion, respectively, were present. *See Cook v. Sheldon,* 41 F.3d 73, 78 (2d Cir.1994); *Cartier,* 955 F.2d at 846; *Golino,* 950 F.2d at 870 (citing *Malley v. Briggs,* 475 U.S. 335, 341,

106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)); *Robison,* 821 F.2d at 921.

### 1. *Sergeant Paddock*

■ Applying the foregoing standards, the Court cannot conclude at the summary judgment stage that defendant Paddock is entitled to qualified immunity as to all of plaintiffs' claims. Although plaintiffs concede that Paddock did not make the initial unannounced entry into Signorile's house, Paddock does not admit to frisking either Signorile or the young men and did not conduct the alleged search of Signorile's house or car, he would be subject to personal liability under Section 1983 as a supervisory officer, "if he ... was grossly negligent in managing subordinates who caused the unlawful condition or event." [7] Obviously, if Paddock would have been entitled to qualified immunity had he himself taken the allegedly wrongful actions, Paddock could not be grossly negligent for supervising others taking such measures.

■ Taking the facts in Paddock's possession, construed in a light most favorable to plaintiffs, officers of reasonable competence would agree that exigent circumstances did not exist to justify a warrantless entry by Paddock into Signorile's home. "The test for determining whether a warrantless entry is justified by exigent circumstances is an objective one that turns on the totality of circumstances confronting law enforcement agents in the particular case." *United States v. Gordils,* 982 F.2d 64, 69 (2d Cir.1992) (quoting *United States v. MacDonald,* 916 F.2d 766, 769 (2d Cir.1990) *(en banc ), cert. denied,* 498 U.S. 1119, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991)), *cert. denied,* —— U.S. ——, 113 S.Ct. 1953, 123 L.Ed.2d 657 (1993); *see also United States v. Zabare,* 871 F.2d 282, 291 (2d Cir.1989) (quoting *United States v. Martinez–Gonzalez,* 686 F.2d 93, 100 (2d Cir.1982), *cert. denied,* 493 U.S. 856, 110 S.Ct. 161, 107 L.Ed.2d 119 (1989). The issue is "whether law enforcement agents were confronted by an 'urgent need' to render aid

---

7. *Moffitt v. Town of Brookfield,* 950 F.2d 880, 886 (2d Cir.1991) (citing *Williams v. Smith,* 781 F.2d 319, 323–4 (2d Cir.1986)). Section 1983 liability may not be premised upon mere negligence.

*Daniels v. Williams,* 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986); *Moffitt,* 950 F.2d at 886 n. 5 (citations omitted).

or take action." *MacDonald*, 916 F.2d at 769 (citations omitted). There are six factors used as guideposts for determining the existence of exigent circumstances:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect 'is reasonably believed to be armed'; (3) 'a clear showing of probable cause ... to believe that the suspect committed the crime'; (4) 'strong reason to believe that the suspect is in the premises being entered'; (5) 'a likelihood that the suspect will escape if not swiftly apprehended'; and (6) the peaceful circumstances of the entry.

*Gordils*, 982 F.2d at 69 (quoting *MacDonald*, 916 F.2d at 769).

One of the key problem in finding exigent circumstances for entering Signorile's home is that officers of reasonable competence, having the facts available to Paddock, would agree that neither the "clear showing" of probable cause specified in the *MacDonald* test, nor even probable cause alone, supported such an entry. "Probable cause to arrest exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Golino*, 950 F.2d at 870 (citing *Dunaway v. New York*, 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 2254 n. 9, 60 L.Ed.2d 824 (1979)); *see also Gerstein v. Pugh*, 420 U.S. 103, 111, 95 S.Ct. 854, 861, 43 L.Ed.2d 54 (1975).

In the instant suit, Paddock saw Signorile get out of the Jaguar parked in front of his house but saw no one else. Signorile did not manifest any negative reaction upon seeing Paddock's patrol car. The Jaguar was snow-white in color and clean on the date in question. Signorile, based on the testimony of officers other than Paddock, appeared to be between 40 and 50 years old, not young, as the assailant had been described by someone at the scene of the crime. These factors militate against finding that officers of reasonable competence would have disagreed as to whether they had probable cause to suspect Signorile of committing the crime in question, much less Greg Signorile or Giordano, who were not even seen exiting the car.

Although the first four digits of Signorile's license plate number were identical to the assailants' license plate number, Signorile was driving in the same direction as the assailants were thought to be heading and both cars were Jaguars,[8] it is doubtful that officers of reasonable competence would agree that these factors constituted probable cause, particularly given the countervailing factors set forth above. Given the facts in Paddock's possession, construed in plaintiffs' favor, it was objectively reasonable for Paddock only to have believed that reasonable suspicion existed to investigate further, by telephoning Signorile to question him or by knocking on his door to make further inquiry. *See, e.g., Terry*, 392 U.S. at 27, 30, 88 S.Ct. at 1883, 1884 (1968); *United States v. Nargi*, 732 F.2d 1102, 1105 (2d Cir.1984).

The second difficulty in finding qualified immunity based on exigent circumstances in the hypothetical case where Paddock himself entered Signorile's home is that officers of reasonable competence would have agreed that the risk was small that Signorile, much less Greg Signorile and Giordano, who had not even been connected to the incident, would escape if not swiftly apprehended. The police had surrounded the house, and incident took place during the day. *See, e.g., Olson*, 495 U.S. at 101, 110 S.Ct. at 1690 (upholding state court judgment that exigent circumstances did not exist in case where, *inter alia*, the police cars had surrounded the house and it was afternoon); *cf. Llaguno v. Mingey*, 763 F.2d 1560, 1567 (7th Cir.1985) (noting that sealing off the house would have been difficult in part because it was nighttime).

Moreover, Paddock indicated that he had followed Signorile's car closely, and Signorile asserts that he knew the patrol car was following him. Yet, construing the facts in plaintiffs' favor, Signorile did not attempt in any way to evade the police. This fact un-

---

**8.** The police dispatcher appears to have notified police officers that the Jaguar involved in the incident, like Signorile's car, had four doors. Paddock claims, however, that he did not know that fact at the time the incident at the Signorile's home took place.

dermines any argument that Paddock could have thought Signorile intended to escape. Indeed, Paddock himself indicates in his deposition testimony that he had radioed for assistance but had specified that it was a non-emergency situation. Under the circumstances, the Court concludes that officers of reasonable competence would have agreed that time remained to obtain a warrant and investigate further, including determining whether the license plate cited by the eyewitness, having two digits different from Signorile's license plate number, was traceable to any address.

While the presence or absence of any one factor enumerated in *Gordils* is not conclusive, *Gordils*, 982 F.2d at 69 (quoting *Medina*, 944 F.2d at 68)), the issues raised above as to probable cause and escape are important for determining whether officers of reasonable competence would have disagreed as to the "urgent need" to enter Signorile's home without a warrant and force him, his son and Giordano out at gunpoint. Moreover, while a "clear showing" of probable cause may not be necessary in every instance to justify exigent circumstances if other factors are present, certainly the absence of probable cause altogether makes any entry into the sanctity of the Signorile's home entirely inappropriate for Fourth Amendment purposes. *See Olson*, 495 U.S. at 95, 110 S.Ct. at 1687 (noting that the purpose of the Supreme Court's decision in *Payton*, 445 U.S. 573, 100 S.Ct. 1371, was to "protect [a suspect's] home from entry in the absence of a magistrate's finding of probable cause"); *Payton*, 445 U.S. at 586, 100 S.Ct. at 1380.

Since the Court has concluded, based on the facts known to Paddock, construed in plaintiffs' favor, that officers of reasonable competence would have agreed that entry into Signorile's home was not justified by exigent circumstances, any subsequent statements made by Signorile within a short period of time would be tainted by the illegal entry. *See, e.g., Washington Square Post 1212 v. City of New York*, 720 F.Supp. 337, 351 n. 10 (S.D.N.Y.1989), *rev'd on other grounds*, 907 F.2d 1288 (2d Cir.1990); *see also Murray v. United States*, 487 U.S. 533, 536, 108 S.Ct. 2529, 2532, 101 L.Ed.2d 472 (1988); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Therefore, Signorile's subsequent statement to Paddock that he was driving within a few blocks of the scene of the crime would arguably have to be suppressed.[9] Assuming suppression of this subsequent statement and using the facts in Paddock's possession, officers of reasonable competence would have agreed that in the same way that probable cause did not support the entry into Signorile's home, probable cause did not exist for the allegedly nonconsensual search of Signorile's car.[10]

Moreover, officers of reasonable competence would have agreed that Paddock did not even have reasonable suspicion to frisk Greg Signorile or Giordano.[11] "The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on the premises where an authorized ... search is taking place." *Ybarra v. Illinois*, 444 U.S. 85, 94, 100 S.Ct. 338, 343, 62 L.Ed.2d 238 (1979) (where police searched a customer of a bar even though they neither recognized him as a person with a criminal history or believed he might be inclined to assault them). In the instant case, Greg Signorile and Giordano had not been seen exiting the car. Nor is there any indication that they appeared in any way threatening to the officers.

Based on the similarity between the two Jaguars and the license plate numbers, however, it was objectively reasonable for Paddock to believe that he had reasonable

---

**9.** Besides this statement, the record does not reveal that the police obtained further information regarding plaintiffs' involvement in the shooting.

**10.** Probable cause would have been required to justify the car search, assuming plaintiffs' facts. *See United States v. Ross*, 456 U.S. 798, 799, 102 S.Ct. 2157, 2159, 72 L.Ed.2d 572 (1982) (describing probable cause standard in car searches).

**11.** Nowhere in the record before the Court is there an indication as to the identity of the officers who frisked the teenagers.

suspicion that Signorile may have been the armed assailant. Given this reasonable suspicion, Paddock would have had grounds to protect himself by frisking Signorile upon his exit from the house. Accordingly, Paddock is entitled to qualified immunity as to his involvement, whether directly or as a supervisor, in frisking Signorile.

As the Court has concluded that Paddock would not be entitled to summary judgment on the basis of qualified immunity had he himself been an active participant in the initial entry of the house, the frisking of Greg Signorile and Giordano and the car search, the question remains whether Paddock, as a superior officer at the scene, would have been grossly negligent in preventing his subordinates from taking these actions. *Moffitt*, 950 F.2d at 886. Material questions abound on the issue of Paddock's gross negligence in his capacity of supervisor. First, it is unclear whether Paddock was in charge of the scene. When asked who the officer in charge of the scene was, Paddock replied, "[t]hat's a question that is impossible to answer." (Paddock Dep. at 42.) Whalen, however, indicated that Paddock did have supervisory authority. Moreover, Parrilla testified that he had thought Paddock to be in charge when Parrilla first arrived at the scene.

Second, some of the officers testified that Paddock told them that an unknown number of occupants were in the house, that the person driving the Jaguar had been speeding and that the Jaguar fit the description of the car involved in the shooting. This testimony cannot be reconciled with plaintiffs' claims. Taking plaintiffs facts as true, as is required in this motion, Paddock could only have misrepresented to the other officers what he had observed. Given the relevant factual issues in dispute and Paddock's presence at the scene throughout the entire incident, whether Paddock was grossly negligent in not ensuring that the officers on the scene acted consistent with a situation in which exigent circumstances and probable cause were absent is a material question of fact for the jury. Accordingly, summary judgment is denied as to Paddock's role as supervisor in the entry of Signorile's home, the car search and the frisking of the two youths.

Summary judgment in Paddock's favor is appropriate, however, on the issue of Paddock's personal involvement in the search of the house. That search, if it in fact occurred, was, as will be discussed in more detail *infra*, not constitutionally justifiable on the basis of any facts on the record, whether alleged by plaintiffs or defendants. Assuming, as the Court is required to do in this motion, that the search did occur, Paddock could not be grossly negligent in allowing it to have taken place, for no indication appears on the record that he knew that it would be undertaken and therefore had a reasonable opportunity to intervene. *See, e.g., O'Neill v. Krzeminski*, 839 F.2d 9 (2d Cir.1988) (where officer had no reasonable opportunity to intercede in preventing a beating that happened in quick succession); *Parker v. Walter Fogg*, 1994 WL 49696 at *8, 1994 U.S.Dist. LEXIS 1696 at *30 (N.D.N.Y. February 17, 1994) (also involving beating of a prisoner). Nor has plaintiff presented any evidence indicating that police procedure requires the senior officer on the scene to be present at the time entry into a premises is made. Given Paddock's inability to have prevented the search, summary judgment in Paddock's favor is warranted on this claim.

Paddock is not, however, entitled to summary judgment concerning whether he himself entered the house after the police had already taken Signorile and the others outside. In addition to his potential supervisory liability, Paddock obviously may be personally liable in a Section 1983 action if he "directly participated in the infraction." *Moffitt*, 950 F.2d at 886. Whalen testified that Paddock at some point entered the house, a fact which Signorile also confirmed but which Paddock denies. The reasons for the re-entry have not been stated on the record presently before the Court. Examining the facts in Paddock's possession, with all factual ambiguities and inferences drawn in plaintiffs' favor, the Court cannot find how Paddock would be entitled to qualified immunity on this late entry when officers of reasonable competence would have agreed that the initial entry into the house was unsupported by exigent circumstances.

The Court must also deny summary judgment with respect to Paddock's direct involvement in driving Signorile and the others to the show-up. Assuming the show-up was conducted under threat of arrest as plaintiffs claim, Paddock would not be entitled to qualified immunity since officers of reasonable competence would agree that, given the facts in Paddock's knowledge and the suppression of Signorile's statement regarding his being near the scene of the shooting, Paddock did not have probable cause to transport Signorile and the others for the show-up.[12]

### 2. *Whalen*

The Court likewise must deny summary judgment to Sergeant Whalen, as material issues of fact exist as to whether he acted with gross negligence in supervising his subordinate officers with respect to the entry into Signorile's home and the frisking of Signorile, his son and Giordano. Whalen admitted during his deposition testimony that he was technically in charge of the investigation. He arrived shortly after Paddock did and was at the scene before the Emergency Service unit entered Signorile's apartment. Until the arrival of Captain Clarke, he was the most senior NYPD officer on the scene.

Yet, Whalen seems to recall little of substance relating to the incident. Whalen did testify that Paddock told him that "[t]he car in the shooting is parked in the driveway over there, and the guys just went into the house." (Whalen Dep. at 46.) Whalen would be entitled to rely on this statement, if in fact it were made, as a law enforcement officer can take action based on the representations of other officers, without personal knowledge of the facts of the case if it seems reasonable to believe that the officers are telling the truth. *See United States v. Hensley*, 469 U.S. 221, 232–3, 105 S.Ct. 675, 682, 83 L.Ed.2d 604 (1985) (holding that under certain circumstances police can rely on flyers or bulletins issued by police in other jurisdictions in conducting investigatory stops); *Beal*

*v. City of New York*, 1994 WL 163954 at *4, 1994 U.S.Dist. LEXIS 5269 at *15 (S.D.N.Y. April 22, 1994); *Rivera v. Granucci*, 1993 WL 76202 at *5, 1993 U.S.Dist. LEXIS 3264 at *12 (D.Conn. March 12, 1993). Indeed, "[w]here different units are engaged in a cooperative law enforcement effort, the mere fact that a fellow officer is from a different unit does not make it unreasonable to trust him." *Beal*, 1994 WL 163954 at *4, 1994 U.S.Dist. LEXIS 5269 at *15. It is unclear from the record, however, that Paddock made this statement if one credits plaintiffs' testimony that Paddock had seen only *one* person exiting the Jaguar. Either Whalen misstated what Paddock told him or Paddock misrepresented to Whalen what Paddock saw. Certainly, the Court cannot rule that plaintiffs have raised no relevant issues of fact as to Whalen's gross negligence when basic facts regarding what Whalen knew are in dispute.

Summary judgment as to Whalen's personal involvement in the show-up must also be denied. Even though Di Franco had only suggested a show-up, Whalen relayed to Paddock that "we would have to do a show-up." (Whalen Dep. at 114.) Whalen also informed Clarke that it had been decided that a show-up would be conducted. Whalen was thus personally involved in the decision-making regarding the show-up. Given the basic dispute concerning the information Whalen received from Paddock regarding the suspects, however, the Court again cannot determine whether officers of reasonable competence would disagree as to the existence of probable cause for Whalen's actions. Thus, contrary to defendants' claims that they are entitled to summary judgment on qualified immunity grounds even if the Court assumes plaintiffs' facts regarding the non-consensual nature of the show-up, the Court finds that a jury question exists as to Whalen's personal liability with respect to the show-up.

---

**12.** If plaintiffs' participation in the show-up was under the clear threat of arrest alleged, the police would have needed probable cause to proceed. *United States v. Mendenhall*, 446 U.S. 544, 557–9, 100 S.Ct. 1870, 1878–9, 64 L.Ed.2d 497 (1980) ("voluntariness is to be determined from all the circumstances").

■ Summary judgment in Whalen's favor is also denied since Whalen himself entered the Signorile's home, admittedly without consent, after Signorile and the others had been taken outside. Few grounds would justify Whalen entering the home once the suspects had been taken outside. Certainly, entering Signorile's home without permission simply to use the telephone, as Whalen admitted, cannot be justified on any reading of the qualified immunity doctrine. The obvious question is whether plaintiffs were harmed by this entry; that, however, must await consideration by the jury at trial.

As with Paddock, summary judgment in Whalen's favor may, however, be granted on the issue of Whalen's personal involvement in the search of the house. The basis for granting summary judgment is the same as in Paddock's case.

### 3. Captain Clarke

■ The Court also denies Captain Clarke's motion for summary judgment. By his own admission, Clarke concurred in the holding of a show-up and ordered the searching of Signorile's car. Assuming that Signorile did not consent to the show-up or car search, defendant Clarke has not shown an absence of material facts as to his liability with respect to these actions. Captain Clarke arrived at the scene after Signorile, Greg Signorile and Giordano had been frisked. He claims to have been informed only that the Jaguar had been followed to the house and that a man had been seen getting out of the car. The record does not indicate that he inquired as to why three men had to participate in a show-up, nor even as to which of the three was seen entering the house. Moreover, there is no evidence that he was informed that Signorile's car had been in the vicinity of the shooting. Nor did Clarke talk with Signorile, Greg Signorile and Giordano, who were still at the scene. Clarke's testimony also fails to show that he had any other conversations with officers at the scene on which he then could have relied. Based on the limited facts presented to the

Court, it is impossible to conclude that officers of reasonable competence would have disagreed concerning the existence of probable cause to support Clarke's concurrence in the show-up and car search. Thus, Clarke is not entitled to summary judgment on the ground of qualified immunity.

Obviously, however, Clarke is not responsible for any of the events occurring prior to his arrival at the scene or of which he was unaware. Therefore, summary judgment is granted in his favor as to the frisking and detention of plaintiffs prior to Clarke's arrival on the scene, any entries made by officers into the Signorile's home and as to the alleged search of the Signorile's home.

### 4. Billings and Ottino

■ Billings and Ottino are also not entitled to summary judgment, as there are numerous material factual questions regarding their involvement in the entry and search of Signorile's home. Paddock claims to have told either Billings or Ottino that those involved in the shooting were probably in the house, that Signorile's Jaguar fit the description of the car involved in the shooting, that the car had been speeding as if to allude the police and that Paddock did not know how many occupants were in the car.[13] This assertion directly contradicts Signorile's claims that he was not speeding and that Paddock saw him enter the house. Although Ottino and Billings were entitled to rely on Paddock's summary, what they were in fact told, and whether that would have made it objectively reasonable for them to believe that they had an exigent basis for entering the house without a warrant, is a material issue for the jury.

■ Even assuming that there had been exigent circumstances for entering Signorile's home, officers of reasonable competence would have agreed that the police were not entitled to search Greg Signorile's bedroom to the extent claimed by plaintiffs. Once lawfully inside the apartment, an officer is permitted to conduct a protective sweep of the premises if the officer believes "based on

---

13. In the portion of Billings's deposition testimony made available to the Court, Billings more generally what Paddock stated. Billings did, though, refer in his deposition to his report from

the incident and imply that the report contained additional information with respect to what Paddock stated.

'specific and articulable facts' " that "the area swept harbored an individual posing a danger to the officer or others." *Maryland v. Buie,* 494 U.S. 325, 327, 110 S.Ct. 1093, 1095, 108 L.Ed.2d 276 (1990); *Medina,* 944 F.2d at 69 (citations omitted). Moreover, officers may make a warrantless seizure under the plain view doctrine to the extent they are " 'lawfully located in a place from which the object can be plainly seen.' " *Bradway v. Gonzales,* 26 F.3d 313, 319 (2d Cir.1994) (quoting *Horton v. California,* 496 U.S. 128, 137, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990)). Based on plaintiffs' assertions, however, the police exceeded these bounds, searching Greg Signorile's room extensively and even examining the contents of his book bag.

Billings and Ottino have been implicated in the search as they were identified by plaintiffs as being in the house around the time the search was conducted. Defendants deny that a search was conducted. Whether Billings and Ottino were involved in any search, and the scope of any search they conducted, are undetermined issues of fact critical in determining whether they are entitled to qualified immunity. Accordingly, summary judgment is inappropriate as to these defendants' entitlement to qualified immunity with respect to the search.

As plaintiffs have not presented any evidence that Billings and Ottino were involved in the frisking of Signorile, Greg Signorile and Giordano, these defendants are entitled to summary judgment on plaintiffs' claims with respect to the frisking.

### 5. *Detective Di Franco*

 Detective Di Franco is entitled to qualified immunity, as he did not participate in any of the constitutional violations that plaintiffs allege. Section 1983 liability cannot attach with respect to a particular defendant unless it can be shown that the defendant participated in or was a moving force behind a particular deprivation of federal rights. *Jeffries v. Harleston,* 21 F.3d 1238, 1247 (2d Cir.1994) (citations omitted), *vacated on other grounds,* ——— U.S. ———, 115 S.Ct. 502, 130 L.Ed.2d 411; *see also Wagner v. County of Cattaraugus,* 866 F.Supp. 709, 718 (W.D.N.Y. 1994) (citing *Jeffries,* 21 F.3d at 1247). By Whalen's undisputed testimony, Di Franco

was not at the scene and was only communicated with briefly by telephone. Although Whalen's testimony that Di Franco merely suggested a show-up is hearsay, it can be used to show that Whalen believed Di Franco's response to be a suggestion, rather than an order. Given Di Franco's limited role, it cannot be said that he was a moving force, or that he even participated, in any of the alleged violation of plaintiffs' Fourth Amendment rights.

### 6. *Officer Strype*

 Strype is likewise entitled to qualified immunity with respect to all of plaintiffs' claims, as the record before the Court indicates that he merely drove plaintiffs Signorile, Greg Signorile and Giordano to the hospital for the show-up at the instruction of his superior officers. The record does not indicate that Strype had any input in the decision to conduct a show-up. Moreover, Strype stayed in the car while the show-up was conducted. He cannot therefore be found to have been the moving force behind the violation of any of plaintiffs' rights. *Jeffries,* 21 F.3d at 1247 (citations omitted); *see also Wagner,* 866 F.Supp. at 718 (citing *Jeffries,* 21 F.3d at 1247 for same proposition).

Further, it was objectively reasonable for Strype to conclude that there was probable cause to proceed with the show-up. Strype's superior officers, Paddock, Whalen and Clarke, had been involved in varying degrees at the scene. "Absent any evidence tending to show that it was objectively unreasonable for [the officer] to disbelieve his superior officer or to question his good faith, [the officer] was entitled to rely upon the [superior] officer in deciding whether there was probable cause ..." *Beal,* 1994 WL 163954 at *4, 1994 U.S.Dist. LEXIS 5269 at *15; *see also Vela v. White,* 703 F.2d 147, 152 (5th Cir.1983) (indicating that the question of whether an officer is liable for arresting a citizen when following the direct orders of his superior is not clear and settled but that where the officer is not familiar with what was happening at the scene, it would be unfair to force the officer to violate a direct order or interrogate a superior officer). Prior to driving the plaintiffs to the show-up,

Strype sat in or stood by his patrol car, and his vision was partial blocked for a portion of the time. Given Strype's limited involvement, it would be unfair to have expected him to question his superior officers on their reasons for proceeding with a show-up.

### 7. *Officer Parrilla*

██ Material issues of fact exist with respect to Parrilla's search of Signorile's car, his frisking of Signorile and his involvement in the show-up, rendering summary judgment on the basis of qualified immunity in Parrilla's favor inappropriate. First, contrary to plaintiffs' assertions, Parrilla claims not to have searched the car or frisked Signorile. To the contrary, Parrilla, asserts that he stayed away from the house, as instructed by Paddock, and could not even see what was happening. These basic factual disputes make summary judgment infeasible.

Second, even assuming for purposes of this motion that Parrilla did search the car, his deposition testimony does not reveal his probable cause basis for doing so. Nor does his testimony indicate whether he had probable cause to transport Signorile's car to the show-up, a seizure of the car for Fourth Amendment purposes. Since Clarke directed that a search be conducted and that the car be transported to the show-up, Parrilla was arguably under orders to take these steps. Nonetheless, Signorile asserts that Parrilla was active at the scene and questioned him in detail regarding the shooting. The Court cannot absolve Parrilla of liability on summary judgment merely on the basis of following orders given Parrilla's allegedly extensive involvement in the incident and his failure to assert any probable cause basis for his actions.

### 8. *Other Defendants*

Even though discovery is at an end, plaintiffs have yet to establish more than a tangential connection of the remaining named officers, Tallarine, Wilson, Lara, Finnegan, Leshinger, and Gosling, to any of the constitutional violations alleged by plaintiffs. Although Lara and Finnegan accompanied the teenagers into Signorile's house, Paddock testified that they did so at his instruction. Given Lara's and Finnegan's seemingly limited involvement and the absence of any indication on the record that they did not have a basis for disbelieving Paddock or questioning his good faith, it was objectively reasonable for these officers to believe that they were justified in accompanying the teenagers into the house. *See Beal*, 1994 WL 163954 at *4, 1994 U.S.Dist. LEXIS 5269 at *14. Accordingly, Officers Tallarine, Wilson, Lara, Finnegan, Leshinger, and Gosling are entitled to qualified immunity with respect to all of plaintiffs' claims.

### B. *Liability of Officers with Respect to Plaintiff DeSantis' Claims*

██ Summary judgment on the basis of qualified immunity is granted in favor of all of the defendant officers as to plaintiff DeSantis's claims. Even construing the facts in a light most favorable to the non-moving party, Paddock did not see which apartment Signorile entered after he exited his car. It was objectively reasonable for the officers to conclude that the similarity in the make of the cars and in the license plate numbers gave them reasonable suspicion to knock on the door of the apartments and request information. *See Terry*, 392 U.S. at 27, 30, 88 S.Ct. at 1883, 1884; *Nargi*, 732 F.2d at 1105. Moreover, it was objectively reasonable for the officers, knowing that the assailant in the shooting was armed, to arm themselves in approaching the apartments, at least until they knew that they were not in danger. *See Terry* 392 U.S. at 24, 88 S.Ct. at 1881; *Alexander*, 907 F.2d at 272.

Signorile's testimony that he saw guns pointed at the door of his mother-in-law's apartment is not in conflict with Billing's testimony that he averted his gun from the door as soon as soon as he was able to determine that the person at the door was an older woman. Plaintiffs have presented no testimony indicating that the police pointed a gun at DeSantis after they determined her identity. As such, plaintiffs have not met their burden of presentation of material issues of fact on this claim.

### C. Excessive Force as to Plaintiffs Signorile, Mrs. Signorile, Greg Signorile and Giordano [14]

■ Plaintiffs also allege that they were placed in "mortal fear and terror" by the pointing of a loaded shotgun and other firearms at their persons "without justification", that they were verbally mistreated and offered no apology and that their personal property was damaged. (Proposed Second Amended Complaint at ¶¶ 40(b), 42(b), 44(b), 46(b), 48(b).) To the extent that these constitute claims of excessive use of force, the claim relating to the use of firearms cannot be decided by the Court on summary judgment, for the appropriateness of that use of force is closely linked to whether it was objectively reasonable for the officers to have believed that their conduct was justified by exigent circumstances and probable cause. The Court has to a large extent deferred this latter question for decision by the jury.

■ As to plaintiffs' remaining claims of property damage and mistreatment, the Court cannot find a basis for denying summary judgment. While the right of an individual not to be subjected to excessive force has long clearly established, *Calamia v. City of New York*, 879 F.2d 1025, 1036 (2d Cir. 1989),

> [n]ot every push or shove by a state officer constitutes a violation of substantive due process. Whether the constitutional line has been crossed depends on 'such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'

*Robison*, 821 F.2d at 923 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). None of plaintiffs' claims of property damage or verbal abuse, if true, come near to describing force that would be considered excessive, injurious or malicious for Fourth Amendment purposes. Parrilla, who supposedly searched plaintiffs' car roughly and broke a heating panel, only

caused minor property damage. Minor also is the other property damage that plaintiffs allege. Both the property damage claims and Greg Signorile's assertion that a police officer reprimanded him as he walked into the victim's hospital room clearly would not, if true, rise to the level of constitutional violations under Section 1983. *See, e.g., Beal*, 1994 WL 163954 at *6, 1994 U.S.Dist. LEXIS 5269 at *22 ("Generally, mere verbal abuse, and even vile language, does not give rise to a cognizable claim under 42 U.S.C. § 1983." (citations omitted)); *Samuels v. Smith*, 839 F.Supp. 959, 965–6 (D.Conn.1993). Certainly if the foregoing do not constitute excessive force, the officers' refusal to apologize, while not a wise choice from the public relations perspective, cannot be a basis for liability. The Court therefore concludes, as a matter of law, that the property damage and verbal abuse alleged by plaintiffs are not actionable under Section 1983 and that, accordingly, summary judgment on this issue in defendants' favor is warranted.

■ Plaintiffs also state that two officers were overheard describing Signorile's neighborhood as one in which "Mafia" lived and that an officer told a neighbor that someone in Signorile's house was a suspect in a shooting. While these comments, if true, are unfortunate, they also do not rise to the level of a constitutional violation. Moreover, the Report indicates that the neighbors that heard the ethnic slur would not be able to identify the officer who made it, rendering this claim unprovable.

## II. Municipal Liability

### A. Summary Judgment as to the NYPD

■ Turning to plaintiffs' claims against the municipal defendants, the Court grants defendant NYPD's motion for summary judgment on the ground that the NYPD is not a properly suable entity. As an agency of the City, the NYPD can sue and be sued only in the name of the City. *See* New York City Charter, Chapter 16, § 396; *Stovall v. City of New York*, 1988 WL 249389 at *4, 1988 U.S.Dist. LEXIS 18559 at *7 (S.D.N.Y. Dec. 6, 1988) (citations omitted); *Martin v.*

14. The claim of excessive force by DeSantis is subsumed in Part B of Section I.

*City of New York,* 627 F.Supp. 892, 894 n. 2 (E.D.N.Y.1985).

Defendant NYPD asserts that the City should not be substituted as a defendant. Both the First Amended Complaint and plaintiffs' proposed Second Amended Complaint, however, already include the City as a defendant.[15] Accordingly, the Court will substitute the City as the party moving for summary judgment in lieu of the NYPD. With this substitution, the Court proceeds in considering the City's and the NYCHA's motions for summary judgment.

### B. *Municipal Liability for Failure to Promulgate, Implement and Enforce Procedures*

Plaintiffs allege that the City and the NYCHA are liable under Section 1983 for failing to develop, implement and enforce procedures intended to "minimize the pursuing, questioning, apprehending, searching, and arresting of innocent members of the public, especially when the police are in hot pursuit of suspects of serious crimes and, more particularly, when the use of drawn firearms, including shotguns are involved, including joint efforts by the NYCHA and NYPD. Department personnel from different boroughs." (Proposed Second Amended Complaint at ¶¶ 50(a) & (b), 54(a) & (b).) This claim in large part constitutes an allegation that the City and the NYCHA failed to train their employees properly as to the public's constitutional rights. The City and the NYCHA argue that they are not municipally liable since plaintiffs have alleged no more than a single example, the incident in question, to support their claim.

The Court agrees that defendants have failed to adduce evidence sufficient to avoid summary judgment as to this claim.

In order to hold a municipality liable under § 1983 for the conduct of employees below the policymaking level, a plaintiff 'must show that the violation of his constitutional rights resulted from a municipal custom or policy.' ... The inference that such a policy existed may arise from 'circumstantial proof, such as evidence that the munic-

ipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.' ... the simple recitation that there was a failure to train municipal employees does not suffice to allege that a municipal custom or policy caused the plaintiff's injury.

*Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993); *see also Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 690–1, 98 S.Ct. 2018, 2035–6, 56 L.Ed.2d 611 (1978) (recognizing, by holding that a municipality can be held liable for its "custom," that less than formal municipal conduct can in some instances give rise to municipal liability under Section 1983); *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 122 (2d Cir.1991). "Similarly, there must be proof of such a custom or policy in order to permit recovery on claims against individual municipal employees in their official capacities, since such claims are tantamount to claims against the municipality itself." *Dwares,* 985 F.2d at 100. Even after completion of discovery and after viewing the evidence in their favor, plaintiffs have not presented a single incident other than the case at bar supporting their claim that the City and the NYCHA's procedures were so inadequate as to signify deliberate indifference to the public's constitutional rights. Plaintiffs even fail to mention generally in their complaint the existence of a pattern of constitutional violations arising from the City's or the NYCHA's failure to develop, implement and enforce appropriate regulations. Nor have plaintiffs even identified specifically the procedures that should have been developed or that were developed but not implemented or enforced, much less established that the failure to develop, implement or enforce any such procedures was "closely related to the ultimate injury" plaintiffs and others endured. *City of Canton v. Harris,* 489 U.S. 378, 391, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989).

The City, on the other hand, has presented a sworn affidavit of a NYPD deputy commissioner of training describing the training po-

---

**15.** For some reason, the City of New York was inadvertently not listed as a defendant in each complaint's caption but was referred to as a defendant within the body of each complaint.

lice officers receive. Moreover, the affidavit indicates that training is supplemented and updated "on a continual basis." (Aff. of E.L. Scott at ¶ 13.) The NYCHA also filed, for each defendant named in the proposed Second Amended Complaint, a description of the training received by that officer and cites in particular, instruction on the use of force during arrests and in the finding of probable cause. To establish the existence of an alleged constitutionally offensive policy or custom in the face of this countervailing evidence, plaintiffs needed to adduce proof of acts or omissions by the City and the NYCHA that were inconsistent with their stated policies. *See Sisak v. National Railroad Passenger Corporation (Amtrak)*, 1994 WL 144385 at *7, 1994 U.S.Dist. LEXIS 5019 at *20–1 (S.D.N.Y. April 18, 1994) (where Amtrak submitted evidence of the existence of relevant regulations, plaintiff needed to adduce evidence of acts or omissions inconsistent with these regulations in order to avoid summary judgment).

Even assuming that a jury would find that the officers' actions in the instant case were unsupported by probable cause and exigent circumstances, this lone example of improper conduct was simply not enough proof to avoid summary judgment, particularly in the face of the City's and the NYCHA's documentation. "A single incident alleged in a complaint, especially if it involves only actors below the policy making level, generally will not suffice to raise an inference of the existence of a custom or policy." *Dwares*, 985 F.2d at 100 (citations omitted); *see also City of Oklahoma v. Tuttle*, 471 U.S. 808, 823–4, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985); *Fiacco v. City of Rensselaer*, 783 F.2d 319, 326 (2d Cir.1986), *cert. denied*, 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987); *Turpin v. Mailet*, 619 F.2d 196, 201 (2d Cir.) (". . . where senior personnel have knowledge of a *pattern* of constitutionally offensive *acts* by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts" (emphasis added and citations omitted)), *cert. denied*, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980).

Plaintiffs have not alleged facts sufficient for the Court to conclude that this single incident was so brutal or egregious that an inference can be drawn that the unlawful action is attributable to inadequate regulations and training. *See Turpin*, 619 F.2d at 201, 203; *cf. Owens v. Haas*, 601 F.2d 1242, 1247 (2d Cir.1979) (prisoner severely beaten by guards). Moreover, even in the case of an egregious incident, additional evidence must be presented to show inadequate training and deliberate indifference on the part of municipal policymakers. *See Tuttle*, 471 U.S. at 821, 105 S.Ct. at 2435; *Owens*, 601 F.2d at 1246 (noting other evidence that guard was new on the job and that show of force was viewed as an appropriate way to control inmates).

The Report's conclusions regarding the investigation of the incident at the Signorile's home do not save plaintiffs from summary judgment with respect to their claims against the City and the NYCHA for failure to adopt satisfactory regulations. Although the Report, by stating that "a sergeant from the NYPD and the [NYCHA] would not have to listen to any direction either spoke to the other due to rank and difference of agencies," acknowledges that jurisdictional problems existed, the Report does not reveal that this previously had been a problem. (Report at ¶ 19.) Nor in the Report's call for additional training for NYCHA officers in the areas of car stops, hostage taking and NYCHA jurisdiction, is there an allusion to previous difficulties in these areas.

More important, the Report reveals that internal discussions regarding coordination between the NYPD and the NYCHA in areas in which the training of NYCHA officers could be improved were in fact commenced as a result of this incident. (Report at ¶¶ 19, 20.) This positive response to this single incident belies a claim that the City and the NYCHA were deliberately indifferent to possible constitutional violations caused by their employees. Accordingly, the Court grants the motion for summary judgment with respect to plaintiffs' claim that the municipal defendants failed to adopt, implement and enforce necessary regulations. The motion

is also granted against the defendant NYPD and NYCHA officers with respect to their liability in their official capacities.

### C. Municipal Liability for Failure to Investigate and Discipline

Plaintiffs also assert that the City and the NYCHA failed to make a "good faith investigation of the conduct of its officers involved in this incident and other similar police operations" and "failing to discipline its officers involved in this incident and other similar police operations." (Proposed Second Amended Complaint at ¶¶ 54(c) & (d).) The Second Circuit Court of Appeals has held that "the persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy of ratification of constitutional conduct within the meaning of Monell[, 436 U.S. 658, 98 S.Ct. 2018 (1978) ]." Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir.1983) (citations omitted). Yet again, however, "absent more evidence of supervisory indifference, such as acquiescence in a prior pattern of conduct, a policy could not ordinarily be inferred from a single incident of illegality such as a first arrest without probable cause . . ." Turpin, 619 F.2d at 202 (citations omitted).

■ Plaintiffs have alleged a failure by both the City and the NYCHA to discipline their officers in "other similar police operations," (Proposed Second Amended Complaint at ¶ 54(d)), but have not cited any specific examples. This failure to refer to specific instances, may be due, however, to plaintiffs' inability to access the personnel files of the officers involved in the incident until after this summary judgment motion has been decided. (See Undated Order of Magistrate Judge Simon Chrein Regarding Discovery.) Summary judgment is, therefore, premature on this issue since plaintiffs should first have access to at least the portion of these files relating to prior disciplinary proceedings against the individual officers. Accordingly, the Court denies, without prejudice to refile, the motion by the City and the NYCHA for summary judgment on the claim of municipal liability for failure to discipline and investigate their officers.

### III. Pendent Jurisdiction

■ "Under the doctrine of pendent jurisdiction, where state-law claims are joined with a federal claim that has substance sufficient to confer subject matter jurisdiction on the federal court, and the claims derive from a common nucleus of operative fact such that it would ordinarily be expected that they would all be tried in one judicial proceeding, the district court has the power to take jurisdiction of the state-law claims as well." Robison, 821 F.2d at 925 (citing United Mine Workers of America v. Gibbs, 383 U.S. 715, 725-8, 86 S.Ct. 1130, 1138-40, 16 L.Ed.2d 218 (1966)). In this case, all the state-law claims arise out of the same facts as, and are thus intimately connected to, the federal claims. Accordingly, the Court will retain pendent jurisdiction over the state-law claims.

### IV. Section 1981, 1985 and 1986 Claims

Plaintiffs appear to have dropped from the proposed Second Amended Complaint their claims under 42 U.S.C. §§ 1981, 1985 and 1986. The Court, therefore, will not address any issues raised by defendants with respect to these claims.

### CONCLUSION

Based on the foregoing, the Court grants partial summary judgment on the grounds of qualified immunity in favor of defendants Paddock, Whalen, Clarke, Billings, Ottino and Parrilla, as set forth above. The Court also grants in their entirety the motions by defendants Lara, Di Franco, Strype, Gosling, Tallarine for summary judgment on the basis of qualified immunity. Since qualified immunity is available only as to a defendant's personal liability, the defendants will remain parties in this suit in their official capacities, except to the extent otherwise provided in Section II of this Memorandum and Order. The Court also grants summary judgment in favor of the NYPD with respect to plaintiffs' municipal liability claims and in favor of the City and the NYCHA as to any municipal liability for failure to promulgate, implement and enforce regulations related to the alleged constitutional violations. The Court denies, without prejudice and pending further discovery, the motion filed by the City and the

NYCHA seeking dismissal of plaintiffs' municipal liability claims relating to the City's and the NYCHA's alleged failure to investigate and discipline their officers. The parties are requested to schedule a conference before the magistrate judge assigned to the case in order to expedite any further discovery and to establish a schedule for the filing of any new summary judgment motions by the City and the NYCHA after such discovery is completed. Plaintiffs are granted leave to file a new version of their proposed Second Amended Complaint which conforms to the rulings in this Memorandum and Order.

SO ORDERED.