Robert LEDERMAN, Plaintiff,

v.

Sergeants Steve ADAMS, Mary Fasone, and Rappenthal, Officers DiPaolo and Spreen, individually and as employees of the New York City Police Department, The New York City Police Department, and The City of New York, Defendants.

No. 96 Civ. 4569 (DC).

United States District Court, S.D. New York.

March 25, 1999.

John Ware Upton, New York City, for plaintiff.

Michael D. Hess, Corporation Counsel of the City of New York by Chlarens Orsland, New York City, for defendants.

## OPINION

CHIN, District Judge.

In this case, plaintiff Robert Lederman, an artist and president of the organization Artists' Response to Illegal State Tactics

("A.R.T.I.S.T."), was arrested on three separate occasions by police officers employed by defendant New York City Police Department (the "NYPD"). Lederman challenges these arrests on the basis that they were not supported by probable cause. He further alleges that the police arrested him because he protested the arrest of artists purportedly for violating an ordinance, later declared unconstitutional by the Second Circuit, prohibiting artists from selling their artwork on the street without a vendor's license. Lederman asserts several causes of action, including civil rights violations under 42 U.S.C. § 1983.

Defendants move for partial summary judgment. Because genuine issues of material fact exist for trial, defendants' motion is denied.

### BACKGROUND

### A. *The Facts*

Construed in the light most favorable to plaintiff, the facts are as follows:

Lederman is an artist who displays and sells his work on the sidewalks of Manhattan, primarily in the SoHo section of lower Manhattan. (Orsland Decl.Ex. C at 31–34). He is also the president of A.R.T.I.S.T., which advocates for the First Amendment right of artists to display and sell their art. (*Id.* at 42; Am.Compl. ¶ 9). Lederman and other artists formed A.R.T.I.S.T. in 1994 when police began enforcing a New York City general vending ordinance by arresting artists who displayed and sold their art on the street without a license. (Am.Compl.¶ 3). Lederman was thereafter arrested on three occasions in connection with his advocacy activities.

### 1. *The Administrative Code*

The New York City Administrative Code (the "Code") contains regulations governing street vendors. The Code, for example, restricts the locations on the sidewalk where vendors may sell their merchandise. New York, N.Y.Code ("N.Y.Code") § 20–465.[1] In addition, § 20–453 of the Code requires vendors to obtain a license. Until October 10, 1996, street artists were covered by these regulations.[2] Artists therefore were not permitted to sell their artwork on the street without a license. Artists were permitted, however, to display their artwork on the street provided that they did not sell or offer to sell it. (Upton Affirm.Ex. J).

In 1994, Lederman filed two actions in the Southern District of New York against the City of New York (the "City") challenging the constitutionality of the requirement that artists obtain a vending license. *Bery v. City of New York,* 94 Civ. 4253; *Lederman v. City of New York,* 94 Civ. 7216. The district court denied plaintiffs' motion to enjoin enforcement of the general vending laws against street artists. On October 10, 1996, however, the Second Circuit ruled that the provision was unconstitutional as applied to street artists. *Bery v. City of New York,* 97 F.3d 689, 698 (2d Cir.1996), *cert. denied,* 520 U.S. 1251, 117 S.Ct. 2408, 138 L.Ed.2d 174 (1997). The court held that appellants' artwork was "entitled to full First Amendment protection." *Id.* at 696. While the court recognized that the City "had a significant interest in keeping its public spaces safe and free of congestion," the court held that appellants were entitled to a public forum for their expressive activities, and that the City could not bar all street art sales when

---

1. A vendor may not allow any goods or any other item related to vending to "touch, lean against or be affixed permanently or temporarily to any building or structure." N.Y.Code § 20–465(c).

2. The only exception from the license requirement was for general vendors who sold "only newspapers, periodicals, books, pamphlets or other similar written matter." N.Y.Code § 20–453.

less restrictive regulations would suffice. *Id.* at 697.

## 2. *Community Pressure to Enforce License Requirement and the Formation of A.R.T.I.S.T.*

The First Police Precinct (the "First Precinct"), which covers SoHo, receives many complaints from residents and business people of the SoHo community concerning the activities of unlicensed peddlers, including street artists. Those who complain allege that the peddlers draw crowds that congest the neighborhood, pose safety problems, and create unsanitary conditions.

One of the organizations that complains to the First Precinct is the SoHo Alliance, which is a private, volunteer community group. Over the years, a considerable degree of enmity has developed between Lederman and members of SoHo Alliance. Among others who complain of street vending in SoHo to the First Precinct are the local Post Office, Community Board No. 2, and New York City Councilmember Kathryn E. Freed, whose district includes SoHo. Freed testified during her deposition that she also made complaints about street vending to the head of enforcement of consumer affairs and the Office of the District Attorney. (Upton Affirm.Ex. F at 34). Freed complained to the Mayor about the performance of the First Precinct in handling unlicensed vending. (*Id.* at 51).

Lederman alleges that prior to 1994 artists were generally permitted to sell their artwork without a license. (Lederman Aff. ¶ 3). According to Lederman, the police began arresting and threatening to arrest artists in 1994 because the SoHo Alliance pressured the police to remove the street artists from the neighborhood. (*Id.* ¶ 4). In response to these arrests, plaintiff and other artists formed A.R.T.I.S.T. to protest what they viewed as an attack on their First Amendment right to sell and display their art. (*Id.*).

As president of A.R.T.I.S.T., Lederman participated in many demonstrations, issued several press releases, attended community and other meetings, and dis-

tributed leaflets. (*Id.*). When plaintiff witnessed the police harassing or arresting artists for selling their art on the street without a license, he would inform passers-by that the police were arresting artists and explain his opinion that the artists' activities were protected by the First Amendment. (*See* Orsland Decl.Ex. C at 137). Some of the demonstrations included chants such as "Stop arresting artists." (Lederman Aff. ¶ 7).

Prior to October 10, 1996, Lederman repeatedly displayed and sold his artwork on the street without a license. Lederman alleges that as his reputation as spokesperson for the street artists grew, however, he became the focus of police attention and was therefore more likely than other artists to be threatened, harassed, and arrested. (*Id.*). Plaintiff claims that he was frequently threatened with arrest while attending public meetings, speaking on the street, or distributing leaflets. (*Id.*). He further alleges that after an arrest in 1994, a police officer informed him that the Intelligence Division of the NYPD had opened a file on him and was monitoring his activities. (*Id.* ¶ 9).

### 3. *The Arrests*

Lederman alleges that the police unlawfully arrested him because of his advocacy activity. (Compl.¶ 10). In this case, plaintiff challenges three arrests, which occurred on March 25, 1995, April 28, 1996, and May 11, 1996.

#### a. *March 25, 1995 Arrest*

On March 25, 1995 at approximately 5 p.m. in SoHo, Lederman was approached by an artist who told him that another artist, Marika Ley, was being arrested a block away for selling art. (Lederman Aff. ¶ 12). Lederman walked to the location and "saw Ley face down on the pavement with two police officers on top of her." (*Id.*). Plaintiff immediately began speaking to the crowd about the City's and the NYPD's "policy of arresting artists and

selling or destroying the confiscated art." (*Id.*). He also distributed leaflets to people in the crowd who expressed an interest in additional information. (*Id.*). According to Lederman, neither he nor any other member of the public interfered with the police, encouraged anyone to interfere with the police, or blocked any vehicular or pedestrian traffic. (*Id.*).

Defendant Steven Adams, a member of the NYPD, arrived on the scene in a patrol car. (*Id.* ¶ 14). Adams instructed Lederman to stop distributing leaflets and "jabbed [him] in the chest with his hand several times" telling him to "keep walking." (*Id.*). Because on prior occasions Adams had instructed Lederman to walk slowly from corner to corner while demonstrating, so as not to obstruct traffic, Lederman began to do so on that day. (*Id.*). Although Adams returned and again jabbed plaintiff with his hand, instructing plaintiff to stop distributing leaflets, Lederman continued his activity. (*Id.*).

An ambulance arrived on the scene to transport Ley to the hospital. (*Id.* ¶ 15). Neither Lederman nor anyone else blocked the ambulance, interfered with the police, or obstructed traffic. (*Id.*). Several members of the public had been closer than plaintiff to the area of the arrest and the ambulance. (*Id.*). After the ambulance departed, Adams, without saying anything else to plaintiff, "grabbed [Lederman] by the back of the neck and threw [him] against the side of a car." (*Id.* ¶ 16). According to Lederman, Adams then instructed two officers to "drag" him to a police car and "throw" him "horizontally head first" into the car. (*Id.*). Lederman alleges that upon arrival at the precinct, Adams "violently yanked" plaintiff from the car and "pushed and shoved" plaintiff into the precinct, all the while addressing him with expletives and coarse language. (*Id.* ¶ 17). Plaintiff complains that his neck and back hurt for two weeks after this incident. (*Id.* ¶ 18).

At the precinct, Adams charged plaintiff with disorderly conduct. (*Id.* ¶ 17). Lederman was confined in a cell for three hours before he was released. (*Id.*). On June 20, 1995, Judicial Hearing Officer Maurice Gray found Lederman not guilty of disorderly conduct. (*Id.* ¶ 20).

**b. *April 28, 1996 Arrest***

On April 28, 1996 at approximately 11:30 a.m., defendant Mary Fasone, another member of the NYPD, approached Lederman and other artists who were displaying their art at Prince Street between Greene and Mercer Streets in SoHo. (Lederman Aff. ¶ 22). When Fasone threatened to arrest the artists for selling art without a license, plaintiff began to inform passers-by about Fasone's activities. (*Id.*). Plaintiff claims that he photographed Fasone destroying a painting. (*Id.*).

According to plaintiff, even though he did not interfere with Fasone's actions or obstruct traffic, Fasone arrested him and charged him with disorderly conduct and obstructing governmental administration. (*Id.*). On October 25, 1996, after Lederman appeared in criminal court several times, the charges were dismissed. (*Id.* ¶ 23).

During plaintiff's arrest, Fasone and other police officers confiscated plaintiff's artwork, including seventy-five original art prints, and protest signs. (*Id.* ¶ 22). Thereafter, the NYPD informed Lederman that his art had been destroyed. (*Id.*). On or about July 18, 1996, plaintiff filed a notice of claim, but the City has failed to make any adjustment or payment. (Compl. ¶ 28).

**c. *May 11, 1996 Arrest***

According to Lederman, on May 11, 1996 at approximately 2 p.m., he was painting at Prince and Mercer Streets in SoHo and had with him paint brushes, a color palette, a rag, and a can of water. (Lederman Aff. ¶ 25). When defendant Joanne Spreen, an NYPD police officer,

approached plaintiff,[3] plaintiff explained to her that he was painting and that the six paintings he had on display were not for sale. Lederman then showed Spreen two "Display Only" signs that he had put up when he arrived.

During her deposition, Spreen testified that from observing Lederman's activities, she determined that he was attempting to sell his paintings without a license. (Orsland Decl.Ex. D at 14–20). Spreen further testified that she requested that a supervisor come to the scene to verify Lederman's arrest. (*Id.* at 33–34).

Lederman asserts that Spreen then began harassing other nearby artists. When Spreen approached the other artists, plaintiff took a photograph of her, picked up a "Stop Arresting Artists" protest sign and began to inform the public about the "policy" of arresting artists, the existence of a federal lawsuit challenging the constitutionality of that policy, and the sale of confiscated art at auction by the police. (Lederman Aff. ¶ 26). Lederman and several other artists participated in a "short" (five to ten minutes) and "peaceful" demonstration with protest signs and the chant: "Stop arresting artists." (*Id.*). None of the demonstrators, including plaintiff, impeded the pedestrian or vehicular traffic or the activities of the police, and Spreen did not order the protestors to stop demonstrating. (*Id.*).

Toward the end of the demonstration, two other officers, defendants Michael Ruppenthal, incorrectly sued herein as Rappenthal, and Donato DiPaolo, arrived on the scene in a patrol car, conversed with Spreen near plaintiff's paintings, and looked at plaintiff's paintings. (*Id.* ¶ 28). Spreen testified that she explained to Ruppenthal, that based on her observations of Lederman, she wanted to arrest Lederman for unlicensed general vending. (Orsland Decl.Ex. D at 47–49). Ruppenthal authorized the arrest. (*Id.* at 47–48). Lederman took a photograph of the three officers after which they immediately arrested him.[4] (Lederman Aff. ¶ 28). Plaintiff alleges that while he was in custody DiPaolo: (1) threatened to report him to the Internal Revenue Service for failing to pay taxes; and (2) asked plaintiff if he was Jewish and then said: "I think Hitler had some good ideas[,] don't you?" (*Id.* ¶ 30).

At the precinct, plaintiff was charged with unlicensed general vending and disorderly conduct. These charges were dismissed on October 25, 1996 after he was required to appear in court on several occasions. (*Id.* ¶ 31).

When they arrested plaintiff, Ruppenthal, DiPaolo, and Spreen seized the six paintings he had on display. After the criminal charges were dismissed, plaintiff demanded the return of his paintings, but the NYPD informed him that the paintings had been sold or destroyed in September 1996. (Compl.¶ 33). On or about July 18, 1996, plaintiff filed a notice of claim, but the City has failed to make any adjustment or payment. (*Id.* ¶ 34).

## B. *Procedural History*

Lederman filed a complaint on June 19, 1996 against Adams and the City. On August 16, 1996, the City filed an answer denying the allegations and asserting affirmative defenses. Adams filed an answer denying the allegations and asserting affirmative defenses on October 22, 1996.

On February 3, 1997, Lederman filed an amended complaint, including as additional defendants Fasone, Spreen, Ruppenthal, DiPaolo, and the NYPD.[5] The amended

---

3. According to Spreen, before Lederman acknowledged her presence, she told him four times that if he did not have a license, he could not sell his paintings and would have to remove the art from the wall. (Orsland Decl. Ex. D at 30–32).

4. According to plaintiff, the three officers also arrested artist Guillermo Barretto because, while Lederman was being arrested, Barretto said to the officers: "[I]f you're going to arrest him you should arrest me too." (Lederman Aff. ¶ 29).

5. It is well established that as a municipal

complaint is not a model of clarity and purports to assert eight causes of action. It appears, however, to assert claims for assault and battery, false arrest, false imprisonment, malicious prosecution, use of excessive force, and interference with rights to assemble and speak and to due process of law, in violation of the U.S. Constitution as well as state law, based on the March 25, 1995, April 28, 1996, and May 11, 1996 arrests. Plaintiff seeks compensatory and punitive damages under 42 U.S.C. § 1983 and state law against the individual police officers as well as the City, together with equitable relief, attorney's fees, and costs.

This motion followed.

## DISCUSSION

Defendants have not moved for summary judgment with respect to the April 28, 1996 arrest.[6] Hence, I will limit my discussion to the March 25, 1995 arrest, the May 11, 1996 arrest, and the issue of municipal liability.

### A. *March 25, 1995 Arrest*

Adams moves for summary judgment on the claims stemming from his March 25, 1995 arrest of Lederman when plaintiff was protesting the arrest of artist Ley. Five claims are presented: (1) unlawful arrest; (2) malicious prosecution; (3) excessive use of force; (4) assault and battery; and (5) the First Amendment.

#### 1. *Unlawful Arrest*

Adams seeks dismissal of the § 1983 claim for unlawful arrest for disorderly conduct on the basis that he is entitled to qualified immunity.

### a. *Relevant Legal Standards*

#### (1) *Disorderly Conduct*

Under New York law, "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof," she or he engages in certain behavior, including: creating unreasonable noise, using abusive or obscene language in public, disturbing a lawful assembly, obstructing pedestrian or vehicular traffic, congregating with other people in public and refusing to comply with a lawful police order to disperse, and creating a hazardous or physically offensive condition that does not serve a legitimate purpose. N.Y.Penal L. § 240.20.

#### (2) *Probable Cause*

 The right to be free from arrest in the absence of probable cause is well established. Probable cause exists "when the arresting officer has 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" *Nichols v. Village of Pelham Manor*, 974 F.Supp. 243 (S.D.N.Y.1997) (holding that probable cause to arrest for disorderly conduct did not exist where plaintiff, an official of a political party, called police officers "ignoramuses") (quoting *O'Neill v. Town of Babylon*, 986 F.2d 646, 650 (2d Cir.1993)).

#### (3) *Qualified Immunity*

 The doctrine of qualified immunity shields police officers from personal liability for "official conduct that 'does not violate clearly established statutory or constitutional rights of which a reasonable

---

agency or an organizational subdivision of the City, the NYPD is not a properly suable entity. *See Williams v. New York City Police Dep't*, 930 F.Supp. 49, 53, 54 (S.D.N.Y.1996); *see also Signorile v. City of New York*, 887 F.Supp. 403, 421 (E.D.N.Y.1995) ("[T]he NYPD can sue and be sued only in the name of the City."). Hence, as a technical matter, the NYPD is not a proper defendant and the claims against the NYPD are deemed to have been filed against the City.

6. Defendants concede that Fasone's April 28, 1996 arrest of Lederman for disorderly conduct is not amenable to summary judgment because of factual disputes. (Defs. Mem at 4).

person would have known.'" *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 127 (2d Cir.1997) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). An officer is therefore entitled to qualified immunity for false arrest: (1) if it was objectively reasonable for the officer to believe that there was probable cause to make the arrest; or (2) if reasonably competent police officers could disagree as to whether there was probable cause to arrest. *See Ricciuti*, 124 F.3d at 128. In qualified immunity cases, the focus is not on the "correctness of the defendants' conduct, but rather the 'objective reasonableness' of their chosen course of action given the circumstances confronting them at the scene." *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir.1995).

■ Although immunity is usually an issue for the court, where the facts are disputed, "jury consideration is normally required." *Fincher v. County of Westchester*, 979 F.Supp. 989, 1001 (S.D.N.Y. 1997) (quoting *Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir.1994), *cert. denied*, 513 U.S. 1076, 115 S.Ct. 721, 130 L.Ed.2d 627 (1995)); *see Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir.1996) (stating that summary judgment is only appropriate if no dispute exists "as to the pertinent events and the knowledge of the officers"). Defendants are not entitled to summary judgment "if any reasonable trier of fact could find that the defendants' actions were objectively unreasonable." *Lennon*, 66 F.3d at 420. An officer's actions are objectively unreasonable if no reasonably competent officer would have acted the same way under similar circumstances. *Id.* at 420–21.

#### b. *Application*

■ Adams claims Lederman "cannot reasonably assert that he was not guilty of disorderly conduct." (Defs. Mem. at 15). I disagree. A reasonable jury could find that plaintiff was not responsible for the crowd forming or remaining in the area. Lederman testified at his deposition that, when he arrived on the scene, a crowd had

already formed to watch the police arrest Ley, and that the crowd continued to grow because of the police activity, not because of him. (*See* Orsland Decl. Ex. C at 136–37). Further, plaintiff claims that neither he nor anyone else from the crowd blocked the ambulance, interfered or threatened to interfere with police activity, or obstructed vehicular traffic. (Lederman Aff. ¶ 15). Moreover, a reasonable jury could conclude, on the evidence before the Court, that Adams's arrest of Lederman for disorderly conduct was not supported by probable cause and was not objectively reasonable. Accordingly, Adams is not entitled to qualified immunity as a matter of law and his motion for summary judgment in this respect is denied.

#### 2. *Malicious Prosecution*

■ To state a claim for malicious prosecution under New York law, the plaintiff must prove: (1) the initiation or continuation of a criminal proceeding against the plaintiff; (2) the termination of the proceeding in the plaintiff's favor; (3) lack of probable cause to commence the proceeding; and (4) actual malice as motivation for the defendant's actions. *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1051, 140 L.Ed.2d 114 (1998). Here, Adams arrested Lederman and charged him with disorderly conduct; the charges were dismissed; and Lederman alleges actual malice. As the Court has denied Adams's motion for summary judgment on the unlawful arrest claim, Adams's motion to dismiss plaintiff's malicious prosecution claim is also denied.

#### 3. *Excessive Force*

Adams argues that the amount of force alleged by plaintiff does not rise to the level of a Fourth Amendment violation and that therefore he is entitled to summary judgment on the civil rights claim for use of excessive force.

■ To establish that an officer employed excessive force during an arrest, the plaintiff must show that the force constituted an unreasonable seizure of the person "judged from the perspective of a reasonable officer on the scene." *Graham v. Connor,* 490 U.S. 386, 395–96, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *see Landy v. Irizarry,* 884 F.Supp. 788, 798 (S.D.N.Y. 1995). The issue is whether the amount of forced used by the officer was "objectively reasonable" based on the totality of the circumstances. *Graham,* 490 U.S. at 397, 109 S.Ct. 1865. Factors to be considered include: (1) the severity of the crime; (2) whether the suspect poses an immediate threat to the safety of officers or others; (3) and whether the arrestee actively resists arrest or attempts to evade arrest by flight. *Id.* at 396, 109 S.Ct. 1865; *see also Robison v. Via,* 821 F.2d 913, 923 (2d Cir.1987) (considering the need for force, the amount of force used, the injury inflicted, and whether force was applied in good faith or maliciously and sadistically).

Adams cites several cases to support the proposition that the amount of force alleged here does not reach constitutional proportions. These cases are inapposite. In *Hamilton v. Broomfield,* No. 95 Civ. 3241, 1998 WL 17697, at *2 (S.D.N.Y. Jan.20, 1998), for example, the plaintiff admitted that he resisted arrest. Similarly, in *Sassower v. City of White Plains,* No. 89 Civ. 1267, 1995 WL 222206, at *2 (S.D.N.Y. Apr. 13, 1995), plaintiff was convicted of resisting arrest.

Adams also cites *Robison* where the court ruled that an officer prying at the plaintiff's fingers was insufficient force as a matter of law to constitute excessive force. *Robison,* 821 F.2d at 923. The allegations of the force allegedly used by a second officer in *Robison,* however, are similar to the allegations here: The officer there pushed the plaintiff against the inside of her car door, yanked her out of the car, threw her against the fender, and twisted her arm, resulting in bruising that lasted approximately two weeks. *Id.* at

923–24. The Second Circuit held that these allegations were sufficient to preclude summary dismissal of the plaintiff's excessive force claim. *Id.*

■ Lederman has likewise raised a genuine issue of fact as to whether Adams employed excessive force while arresting him. The nature of plaintiff's actions were not violent, plaintiff claims that he did not pose a threat to the safety of officers or others, and there is no evidence that plaintiff attempted to resist arrest or flee. Accordingly, Adams's motion for summary judgment as to the § 1983 claim for excessive use of force is denied.

### 4. *Assault and Battery*

■ An assault is "an intentional placing of another person in fear of imminent harmful or offensive contact"; a battery is "intentional wrongful physical contact with another person without consent." *Charkhy v. Altman,* 252 A.D.2d 413, 678 N.Y.S.2d 40 (1st Dep't 1998) (quoting *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.,* 994 F.2d 105 (2d Cir.1993)); *see Johnson v. Suffolk County Police Dep't,* 245 A.D.2d 340, 665 N.Y.S.2d 440, 440 (2d Dep't 1997) (holding that a police officer committed a battery when he touched the plaintiff during an unlawful arrest). Under New York Penal Law § 35.30, an officer "may use physical force when and to the extent [she or] he reasonably believes such to be necessary to effect the arrest." As discussed above, an issue of fact exists as to whether the arrest was lawful and whether Adams's use of force was reasonable under the circumstances. Accordingly, Adams's motion for summary judgment on the assault and battery claim is denied.

### 5. *First Amendment*

Adams moves for summary judgment on plaintiff's claim of retaliatory arrest and prosecution for exercising his First Amendment right to assemble and speak.

A plaintiff may pursue a claim of retaliatory arrest and prosecution under § 1983. (Defs. Reply Mem. at 8). *See Singer v. Fulton County Sheriff,* 63 F.3d 110 (2d Cir.1995), *cert. denied,* 517 U.S. 1189, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996); *Magnotti v. Kuntz,* 918 F.2d 364 (2d Cir.1990). Adams argues, however, that Lederman has failed to demonstrate that his actions had a chilling effect on his First Amendment activities.

The cases defendants cite are inapposite. In *Mozzochi v. Borden,* 959 F.2d 1174, 1180 (2d Cir.1992), for example, the court held that "[a]n individual does not have a right under the First Amendment to be free from a criminal prosecution supported by probable cause that is in reality an unsuccessful attempt to deter or silence criticism of the government." *See Singer,* 63 F.3d at 120 (stating that the officer had probable cause to arrest the plaintiff). In *Spear v. Town of West Hartford,* 954 F.2d 63, 67 (2d Cir.), *cert. denied,* 506 U.S. 819, 113 S.Ct. 66, 121 L.Ed.2d 33 (1992), the court held that the plaintiff failed to allege with sufficient particularity the purported chilling effect of the defendant's actions.

Here, a question of fact remains as to whether Adams had probable cause to arrest plaintiff or is otherwise entitled to qualified immunity. Further, while Lederman continued his advocacy activities in general, and in that sense his will and effort to exercise his First Amendment rights were not chilled, Adams's actions had an immediate and specific chilling effect on plaintiff in that upon arrest he was unable to continue his demonstration and his First Amendment activities were cut short. Accordingly, Adams's motion for summary judgment on the First Amendment claim is denied.

## B. *May 11, 1996 Arrest*

Spreen, Ruppenthal, and DiPaolo also move for summary judgment on the claims stemming from their May 11, 1996 arrest of Lederman, when plaintiff contends that he was merely painting and displaying his artwork and protesting police enforcement of the license requirement for artists. These claims include: (1) unlawful arrest; (2) malicious prosecution; and (3) the First Amendment.

### 1. *Unlawful Arrest*

Because Spreen arrived at the scene prior to Ruppenthal and DiPaolo, and because Ruppenthal and DiPaolo advance additional arguments, the Court will discuss their roles separately.

### a. *Spreen*

Spreen seeks dismissal of. the § 1983 claim for unlawful arrest for unlicensed vending and disorderly conduct on the ground of qualified immunity.

### 1. *Unlicensed Vending*

Spreen contends that Lederman cannot dispute the unlicensed vending charge because he admitted that he did not have a license and "repeatedly proclaimed his political belief that artists should not be required to have a license to sell art on the street." (Defs. Mem. at 7). Spreen testified that she saw six to eight unlicensed artists, including Lederman, who had their work on the sidewalk; that the artists did not move away from their art; and that passers-by approached and spoke with the artists, but that she did not witness any sales. Spreen argues that her testimony is corroborated by plaintiff's concessions that: He observed Spreen watch the vendors; he displayed his work on the wall; pedestrians were walking by; and Spreen instructed him to remove his art from the wall.

Questions of material fact exist that preclude summary judgment. In his affidavit, Lederman swore to facts upon which a reasonable jury could conclude that Spreen's arrest was not supported by probable cause and was objectively unreasonable. Lederman stated, for example, that he: (1) was painting when Spreen approached him and informed the officer

that he was doing so; (2) told the officer that his paintings were not for sale; and (3) showed the officer two "Display Only" signs that he claims to have put up when he arrived. Lederman thus alleges, under oath, that he was complying with the law.

Spreen argues that "a police officer need not see an actual sale, or even hear actual sale words used, to establish unlawful vending." (Defs. Mem. at 8). In support of this position, Spreen cites *People v. Sylla*, 154 Misc.2d 112, 584 N.Y.S.2d 985 (Crim.Ct.N.Y. County 1992). The arrests challenged in *Sylla* were based on officers observing the defendants for one or two minutes while the defendants stood behind briefcases containing costume watches. *Id.* at 986–87. The defendants argued that they had not made any verbal offers or displayed any price tags, and that there were no potential customers in the vicinity. *Id.* at 987. The court found, however, that the officers could have reasonably inferred from the circumstances that the merchandise was being displayed for sale. *Id.* at 987–88.

In determining whether the defendants were operating as vendors pursuant to § 20–453 of the Code, the *Sylla* court considered: (1) the nature of the goods; (2) their plurality in number; (3) the time, location, and manner of display; and (4) "the obvious, if implicit, availability of the defendants" to sell the goods. I agree with the *Sylla* court that "an offer to sell may be conveyed in ways other than verbal and need not be aggressive to be effective." *Sylla*, 584 N.Y.S.2d at 988. Applying the factors here, and accepting Lederman's version of the facts for purposes of this motion, however, I conclude

that a reasonable jury could find that it was objectively unreasonable for Spreen to conclude that plaintiff was not simply displaying his art but was instead offering his art for sale. Unlike watches, art may be displayed without being offered for sale, and Lederman claims, in any event, to have hung two "Display Only" signs. Accordingly, Spreen is not entitled to qualified immunity as a matter of law and her motion for summary judgment on the § 1983 claim based on unlicensed vending is denied.[7]

### 2. *Disorderly Conduct*

■■■ Plaintiff has succeeded in raising a triable issue of fact as to whether it was objectively reasonable for Spreen to arrest him for disorderly conduct. Lederman denies that he blocked pedestrian traffic on the sidewalk. Plaintiff further denies that he or the other demonstrators were ordered by the police to disperse. Although, as defendants emphasize, Lederman was speaking to the crowd "loud enough to be heard across the street," the level of his voice arguably was not unreasonable for a few minutes at approximately 2 p.m. on the streets of Manhattan. Accordingly, a reasonable factfinder could conclude that plaintiff's arrest was objectively unreasonable and Spreen's motion for summary judgment is therefore denied.

### b. *Ruppenthal and DiPaolo*

Ruppenthal and DiPaolo also claim that they are shielded by qualified immunity because they were entitled to rely upon Spreen's representation of the facts. DiPaolo further argues that he is entitled to

---

7. Spreen further argues that plaintiff violated § 20–465(c) of the Code because his paintings were on the wall of a building. Spreen asserts that there is no "informal verbal permission" exception to the prohibition against hanging or leaning paintings on walls. Lederman did not violate § 20–465(c), however, if he was not acting as a general vendor at the time of the incident. If Lederman was merely displaying his artwork, he would not be a general vendor pursuant to § 20–452(b) and

therefore would not be subject to § 20–465(c), which states that: "No vending vehicle, push-cart, stand, goods or *any other item related to the operation of a vending business* shall touch, lean against or be affixed permanently or temporarily to any building or structure...." If Lederman's paintings were not on sale on May 11, 1996, then they would not be "items related to the operation of a vending business" and therefore Lederman would not have been in violation of § 20–465(c).

qualified immunity because his superior, Ruppenthal, authorized the arrest.

■ A law enforcement officer without personal knowledge of the facts is permitted to take action based on the representations of another officer, if it is reasonable to believe that the other officer is telling the truth. *Signorile v. City of New York,* 887 F.Supp. 403, 417 (E.D.N.Y.1995) (citing *United States v. Hensley,* 469 U.S. 221, 232–33, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)). If the defendant was aware of information at the time of the arrest that would have undermined a finding of probable cause, however, 'that knowledge could defeat the defense of probable cause. *Amaker v. Coombe,* No. 96 Civ. 1622, 1998 WL 637177, at *8 (S.D.N.Y. Sept. 16, 1998); *see also Shaw v. City of New York,* No. 95 Civ. 9325, 1997 WL 187352, at *4 (S.D.N.Y. Apr.15, 1997) ("*Absent circumstances that raise doubt as to their veracity,* an officer is entitled to rely upon the statements of … fellow police officers." (emphasis added)).

■ Plaintiff has presented sufficient evidence to raise a genuine issue of fact as to whether Ruppenthal and DiPaolo were entitled to rely on Spreen's statements under the circumstances. According to Lederman, prior to his arrest, Ruppenthal and DiPaolo conversed with Spreen close to plaintiff's art. Ruppenthal and DiPaolo arguably were able to see the "Display Only" sign and painting paraphernalia that plaintiff claims were in plain view. Further, it is unclear from the transcript of Spreen's deposition what exactly she told the other two officers and defendants have not submitted affidavits from Ruppenthal and DiPaolo.[8] Ruppenthal and DiPaolo may therefore also have known that plaintiff said to Spreen that his art was not for sale.

Defendants argue that Ruppenthal and DiPaolo should not have been required to make an "independent credibility assessment." While there are circumstances under which officers may rely solely on the representations of a fellow officer, a reasonable jury could conclude that it was objectively unreasonable for Ruppenthal and DiPaolo to have done so here. Accordingly, Ruppenthal and DiPaolo's motion for summary judgment is denied.

### 3. *Malicious Prosecution*

As was the case with Adams's March 25, 1995 arrest of Lederman, here, Lederman was arrested and charged with unlicensed vending and disorderly conduct; the charges were dismissed; and he alleges actual malice. Because a question of fact remains as to whether the arrest was supported by probable cause or whether these defendants are otherwise entitled to qualified immunity, their motion to dismiss Lederman's malicious prosecution claim is denied.

### 4. *First Amendment*

Again, as was the case with Adams's March 25, 1995 arrest of Lederman, here, a question of fact remains as to whether Spreen, Ruppenthal, and DiPaolo had probable cause to arrest plaintiff or were otherwise entitled to qualified immunity. Further, the May 11, 1996 arrest had an immediate and specific chilling effect on plaintiff in that, upon arrest, he was unable to continue his demonstration and his First Amendment activities were again cut short. Accordingly, the three officers' motion for summary judgment on the retaliatory arrest and prosecution claim is denied.

---

**8.** During her deposition, Spreen apparently merely informed Ruppenthal that based on her observations, she wanted to arrest Lederman for unlicensed vending. (*See* Orsland Decl. Ex. D at 48). Spreen apparently told Ruppenthal merely that she observed plaintiff, but did not tell him the specific facts that she observed. (*Id.* (stating "I didn't explain" when asked whether she told Ruppenthal what her observations were)). In their briefs, however, defendants represent that Spreen recited the facts to Ruppenthal. (Defs. Mem. at 12; Defs. Reply Mem. at 4).

### C. *Municipal Liability*

■ To establish a municipality's liability under § 1983 for unconstitutional acts by an employee who is below the policy-making level, a plaintiff must show that the constitutional violation was caused by a municipal custom or policy. *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995); *see Monell*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A plaintiff need not prove that the municipality had an explicitly stated rule or regulation; instead, a plaintiff may show that the municipality exhibited deliberate indifference to the possibility of such a constitutional violation. *Vann*, 72 F.3d at 1049.

■ Lederman has presented sufficient evidence to demonstrate the existence of genuine issues of material fact as to whether the City had an informal policy to deny him and other artists their constitutional rights. The record contains evidence that policymakers, including the Mayor, the Police Commissioner, and the District Attorney, were pressured by the SoHo community and others to rid their streets of unlicensed vendors, including unlicensed artists and Lederman in particular, and that this pressure was relayed to the First Precinct. Further, plaintiff has presented evidence that certain police officers knew and disliked him because of his advocacy activities. Moreover, Lederman was thrice arrested and each time the charges were dismissed. Many of his paintings were destroyed and others artists were arrested as well. A jury could conclude, on the basis of this evidence, that there existed a municipal policy to drive the artists out of the SoHo community. Accordingly, the City's motion for summary judgment is denied.

### *CONCLUSION*

For the reasons stated above, defendants' motion for partial summary judgment is denied. The parties shall appear for a pretrial conference on April 9, 1999 at 11 a.m. in Courtroom 11A at 500 Pearl Street.

SO ORDERED.